UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

LANCE JAMES                                    CIVIL ACTION

VERSUS                                         NUMBER: 10-0194

BURL CAIN, WARDEN                              SECTION: "D"(5)

## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2E(A), presently before the Court is the 28 U.S.C. §2254 application for federal habeas corpus relief of petitioner, Lance James, and the State's response thereto.  (Rec. docs. 1, 9).  Having determined that an evidentiary hearing is not necessary, it is recommended, for the reasons that follow, that the instant petition be dismissed with prejudice.

## PROCEDURAL HISTORY

Petitioner James is a state prisoner who is presently incarcerated at the Louisiana State Penitentiary, Angola, Louisiana.  On November 11, 1999, James was indicted for the first degree murder of Athumus Dunn.  At his arraignment on November 15, 1999, James pled not guilty.  In December, 1999, the court ordered a sanity commission appointed, and on February 22, 2000 the court found James incompetent to proceed.  However, James was

subsequently reevaluated, and on May 31, 2002, the court found him competent to proceed. (St. rec., vol. 3 of 9).

On August 14, 2002, the State amended the indictment to charge James with second degree murder.  On August 27, 2002, James withdrew his plea of not guilty and entered a dual plea of not guilty/not guilty by reason of insanity.  On October 10, 2002, at the conclusion of a three-day trial, a twelve-person jury in Orleans Parish Criminal District Court found James guilty as charged.  On November 18, 2002, the court sentenced James to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.  On February 3, 2004, the court granted James' motion for an out-of-time appeal.

On February 23, 2005, the Louisiana Fourth Circuit Court of Appeal affirmed James' conviction and sentence.  State v. James, 897 So.2d 821, No. 2004-KA-0878 (La. App. 4 Cir. 2005).  On January 27, 2006, the Louisiana Supreme Court denied James' writ application.  State v. James, 922 So.2d 542, No. 2005-KO-1173 (La. 2006).  James' conviction became final ninety days later, on April 27, 2006, when the time for seeking a writ of certiorari from the U.S. Supreme Court expired and no application therefor was made. See U.S. Sup. Ct. R. 13(1); Roberts v. Cockrell, 319 F.3d 690, 694 (5th Cir. 2003).

On September 19, 2006, James filed an application for post-

conviction relief with the state district court. (St. rec., vol. 2 of 9). On August 6, 2008, Orleans Parish Criminal District Court Judge Terry Alarcon issued a Judgment denying James post-conviction relief. (St. rec., vol. 3 of 9). On October 6, 2008, the Louisiana Fourth Circuit Court of Appeal, finding "no error" with the district court's August 6, 2008 judgment, likewise rejected James' application for post-conviction relief. State v. James, No. 2008-K-1206 (La. App. 4 Cir. Oct. 6, 2008)(unpublished decision). (St. rec., vol. 2 of 9). The Louisiana Supreme Court, on September 4, 2009, again denied a writ application from James, this time refusing to review the denial of post-conviction relief. State ex rel. James v. State, 17 So.3d 956 (2009), No. 2008-KH-2631 (La. 2009).

On January 4, 2010, James filed the instant habeas corpus application. In his habeas application, James raises the following claims: (1) that the trial court erred in denying his motion to suppress his confession because his mental deficiency rendered him unable to knowingly and intelligently waive his Miranda rights; and, (2) that his trial counsel was constitutionally ineffective for failing to investigate his mental health history which would have supported his insanity defense and for failing to procure witnesses whose testimony would have supported his insanity defense. The State, in its response, admits that petitioner has

3

properly exhausted his state court remedies as required under <u>Rose v. Lundy</u>, 455 U.S. 509 (1982).  (Rec. doc. 9, pp. 8 and 9).  The State, however, asserts that the instant action is untimely.  (Rec. doc. 9, p. 5).

**<u>TIMELINESS</u>**

Under 28 U.S.C. §2244(d)(1), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L.No. 104-132, 110 Stat. 1214 (1996)(effective April 24, 1996), state prisoners like James have one year from the date that their convictions become final to timely seek federal habeas corpus relief.  Section 2244(d)(2) further provides that the time during which a prisoner has a properly filed application for post-conviction relief or other collateral review pending before the state courts is not counted against the one-year limitation period.  Although the State has done so in this case, the one-year time bar may be raised by the Court <u>sua</u> <u>sponte</u>.  <u>Kiser v. Johnson</u>, 163 F.3d 326, 328-29 (5th Cir. 1999).

James' conviction and sentence became final on April 27, 2006.[1]  Under §2244(d), James thus had until April 27, 2007, within

_____

[1]The Supreme Court, in <u>Jimenez v. Quarterman</u>, ___ U.S. ___, 129 S.Ct. 681, 686 (2009), determined that a state court's grant of a right to file an out-of-time appeal resets the date when a conviction becomes "final" under the AEDPA.  Thus, the time, in excess of one year, between November 18, 2002, when James was sentenced, and February 3, 2004, when his out-of-time appeal was

which to timely seek federal relief unless the one-year time period was tolled by the pendency of a properly-filed application for post-conviction relief or other collateral review.

On September 19, 2006, James filed with the state district court an application for state post-conviction relief, thereby tolling prescription.  At that point, approximately 149 days of James' 365-day prescriptive period had expired.  Tolling then continued uninterrupted for the duration of the post-conviction proceedings, so long as James sought supervisory review in a timely manner.  Grillette v. Warden, Winn Correctional Center, 372 F.3d 765, 769-70 (5th Cir. 2004).

The State argues that tolling ceased upon James' failure to timely seek review of the trial court's August 6, 2008 decision denying his post-conviction application.  Pursuant to Louisiana Uniform Rules of the Courts of Appeal Rule 4-3, James had 30 days, until September 5, 2008, to timely file a writ application with the Louisiana Fourth Circuit Court of Appeal.  See Melancon v. Kaylo, 259 F.3d 401, 404-06 (5th Cir. 2001).

James admits that "his writ application was indeed late," stating that he did not file it with the state appellate court

---

granted, has no bearing on the timeliness of James' petition.

until September 15, 2008.  (Rec. doc. 10, p. 2).[2]  The Louisiana Fourth Circuit Court of Appeal, in denying James' writ application, made no mention of the fact that the application was untimely.

In Grillette, supra, the petitioner's post-conviction writ application to the state appellate court was filed outside the 30-day deadline, but the state appellate court, in rejecting the writ application, made no mention of the application's untimeliness. Under these circumstances, the Fifth Circuit determined that prescription was tolled during the period the untimely writ application was pending before the state appellate court, reasoning:

> [A]t no point did the state trial court or the Louisiana Court of Appeal fault Grillette for failure to comply with Rule 4-3.  Whereas in Melancon, the Louisiana Court of Appeal expressly indicated that Melancon's application "appeared untimely," in this case it is undisputed that the Louisiana Court of Appeal disposed of Grillette's application "on the merits," without any notation that his application was time-barred.  We acknowledge, as the State asserts, that a state court's consideration of an application "on the merits" is not by itself conclusive proof that the application was timely filed in accordance with that state's timeliness laws and rules and thus "pending."  See [ Carey v.] Saffold, 536 U.S. [214,] 226, 122 S.Ct. 2134 [ (2002) ] (noting different reasons why a court might "address the merits of a claim that it believes was presented in an untimely

_____

[2]A copy of James' writ application is contained in the State rec., vol. 9 of 9.  James did not date his writ application nor is there any post-mark date to indicate when the writ application was mailed.  His writ application was received by the Louisiana Fourth Circuit on September 23, 2008.

way"). Rule 4-3, however, prohibits the Court of Appeal from considering the merits of an application that is not filed with the appellate court within the original or extended return date, "in the absence of a showing that the delay in filing was not due to the applicant's fault." Because the Court of Appeal did consider the merits of Grillette's application, it must have determined that the application was timely either because the trial court impliedly extended the return date and/or because the delay was not due to Grillette's fault.

Moreover, as Grillette correctly points out, when the denial of an application is based on untimeliness, Louisiana courts routinely and unmistakably indicate so in their opinions. See, e.g., Carter v. Rhea, 785 So.2d 1022, 1022 (La. Ct. App. 4th Cir. 2001) ("WRIT APPLICATION DISMISSED AS UNTIMELY."); Lawyer v. Succession of Kountz Through Cupit, 703 So.2d 233, 233 (La. Ct. App. 4th Cir. 1997) ("WRIT NOT CONSIDERED."); Watts v. Dorignac, 681 So.2d 955, 955 (La. Ct. App. 1st Cir. 1996) ("WRIT NOT CONSIDERED"). Thus, had the Louisiana Court of Appeal decided to reach the merits of the application notwithstanding a determination that the application was untimely, it appears that the court would have indicated any such untimeliness in its opinion.

Grillette, 372 F.3d at 775.

In its decision to toll prescription despite the untimeliness of petitioner's writ application to the state appellate court, the Grillette court took note of factors reflecting due diligence on the part of Grillette in attempting to timely seek state post-conviction relief. Specifically, the court pointed to the fact that Grillette "gave timely oral notice to the trial court of his intent to file a supervisory writ application and the trial court, by setting a return date beyond Rule 4-3's 30-day period . . .

impliedly extended the return date under extenuating circumstances that were due to no fault [on the part of petitioner]." Id. at 771.

Unlike the situation in Grillette, there are no factors reflecting due diligence on the part of James in attempting to timely seek state post-conviction relief. James argues that he was unable to timely file his writ application with the state appellate court due to the fact that Hurricane Gustav "struck" on September 1, 2008. As a result, the prison "was without power from September 1st through September 13th, 2008", "was under 'lock down' for nearly three weeks", and "the prison law library was shut down and inmate counsels were unable to provide legal assistance to inmates". (Rec. doc. 10, pp. 2-3). As proof, James has provided a log sheet which reflects: "LIBRARY CLOSED DUE TO HURRICANE" for four days, 8/31/08 through 9/03/08. (Rec. doc. 10-1).[3]

The fact that Hurricane Gustav "struck" on September 1, 2008, and the corresponding effects it had on the prison, are insufficient to excuse the untimeliness of James' state post-conviction writ application. By the time Hurricane Gustav arrived,

---

[3]The log further reflects that the library was closed for unspecified reasons for two days, 09/04/08 and 09/05/08, from 7:00 p.m. to 4:30 a.m.; and was closed for eight days, 09/06/08 through 09/13/08, from 7:00 p.m. to 6:00 a.m.

James' 30-day time limit for filing his writ application with the Louisiana Fourth Circuit had almost expired.  Clearly James did not act with due diligence if he waited until such a late date to commence working on his writ application.  Further, it is well-established that a prisoner's lack of access to a law library and/or inmate legal counsel do not provide a basis for tolling his prescriptive period.  As the court explained in <u>Rood v. Quarterman</u>, 2009 WL 2018991, *2 (S.D. Tex. July 10, 2009), a "petitioner's allegations of <u>pro se</u> status and limited access to law libraries and other resources are incident to ordinary inmate status ... and do not constitute grounds for statutory or equitable tolling of limitations."  <u>See also</u> <u>Horne v. Cain</u>, 2010 WL 1332977, *6 (E.D. La. Feb. 24, 2010) (Knowles, MJ; <u>adopted</u>, 2010 WL 1333055 (E.D. La. Mar. 29, 2010) (Vance, J); <u>Bunley v. Jones</u>, 2009 WL 2868427, *3 (E.D. La. Aug. 11, 2009) (Moore, MJ; <u>adopted as modified</u>, 2009 WL 2868424 (E.D. La. Aug. 31, 2009) (McNamara, J).

Because James' writ application to the Louisiana Fourth Circuit was untimely and there are no factors reflecting due diligence on the part of James which would warrant a tolling of prescription despite his untimeliness, the court finds that prescription commenced to run on September 5, 2008, when his 30-day time period for timely seeking relief from the state appellate court expired.  See <u>Melancon</u>, 259 F.3d at 406 (writ application

9

ceases to be "pending", for purposes of interrupting prescription, when application to the next level of state-court review is not timely made).  Prescription continued to run for 51 days until October 27, 2008, when James timely filed a writ application with the Louisiana Supreme Court seeking relief in connection with the state appellate court's October 6, 2008 opinion denying him post-conviction relief.[4]  At that point, 200 days of James' 365-day prescriptive period had expired.[5]

---

[4]Under Rule X, §5(a) of the Rules of the Louisiana Supreme Court, James had 30 days in which to seek relief from the state supreme court.  A copy of James' writ application, 08-KH-2631, to the Louisiana Supreme Court is contained in the State rec., vol. 9 of 9.  While James did not date his writ application, there is a handwritten notation, "P.M. 10/27" on the front page of the application.  This Court's staff, via a telephone conference with the Clerk of Court's Office for the Louisiana Supreme Court, verified that "P.M." stands for "post-marked" and that James' writ application was post-marked October 27, 2008.

In Causey v. Cain, 450 F.3d 601, 604-605 (5th Cir. 2006), the United States Fifth Circuit determined that the federal "mailbox rule" should be employed when determining the filing date of state court pleadings for purposes of determining the timeliness of a federal habeas petition.  Under the "mailbox rule," the date a pro se prisoner's pleading is provided to prison officials for mailing is the date it is considered filed. See Cooper v. Brookshire, 70 F.3d 377, 379 (5th Cir. 1995). Generally, a court will look to the date a prisoner signed his pleading as the earliest date the pleading could have been provided to prison officials for mailing.  See Colarte v. Leblanc, 40 F.Supp.2d 816, 817 (E.D. La. 1999).  Because James did not date his writ application to the Louisiana Supreme Court, the Court will utilize the post-marked date of the pleading as the filing date.

[5]The State, in arguing that the instant action is untimely, does not toll the time in which James' timely-filed writ

Prescription remained tolled until September 9, 2009, when the Louisiana Supreme Court denied James' writ application.  State ex rel. James v. State, 17 So.3d 956, No. 2008-KH-2631 (La. 2009).  At that point, prescription once again commenced to run, running for 116 more days until, on January 4, 2010, James filed the instant action.

On the date he filed his federal habeas corpus petition, James had 49 days remaining until his statute of limitations expired.  Accordingly, contrary to the State's argument, the instant action is timely.  Therefore, this Court shall proceed to address the merits of petitioner's claims following its recitation of the facts and applicable standard of review.

**FACTS**[6]

On the evening of August 7, 1999, Arthumus Dunn was shot to death on the sidewalk in front of 2622 S. Galvez Street.  Police

---

application with the Louisiana Supreme Court was pending.  (Rec. doc. 9, p. 5).  The State, however, provides no case law to support its position in this regard and this Court has found no supporting jurisprudence.

[6]The facts as set forth hereinafter are as found by the state appellate court in its decision on James' appeal.  State v. James, 897 So.2d 821, 822 (La. App. 4th Cir. 2005).  James has not taken issue with the accuracy of this factual recitation by the state court.  Further, this court's review of the trial transcript supports the factual accuracy of the findings made by the state appellate tribunal.

officers responding to the scene found Dunn's body lying on the
sidewalk next to a chair.  They also found a 9 mm shell lying next
to his body.  They found no guns near Dunn's body, and his wallet
was empty.  However, there was jewelry on his body.  An autopsy
performed the next day showed Dunn died of a gunshot wound to his
left temple, with the bullet exiting the other side of his head.
There were powder marks around this wound, leading the forensic
pathologist who performed the autopsy to conclude that Dunn was
shot at close range.  Dunn had a second, superficial gunshot wound
behind his left ear, and the pathologist was able to retrieve a
spent 9 mm bullet from this wound.  Fluids taken from Dunn's body
were negative for both alcohol and street drugs.

     N.O.P.D. Homicide Det. Bernard Crowden testified that he
responded to the call of the murder.  He testified that no
witnesses came forward on the night of the shooting, but that
sometime afterward he received a tip that a young man named Lance,
who possibly lived in the next block, was the perpetrator.  Det.
Crowden testified that he discovered the defendant, Lance James,
lived in that block.  Det. Crowden stated that on September 14,
1999, he went to the defendant's house, spoke with the defendant's
grandmother, and left his number for the defendant to call him.
Later that day, the defendant called Det. Crowden and agreed to
meet with him, and officers escorted James to the Sixth District

police station.  Det. Crowden testified that George Haynes, the defendant's cousin, also accompanied the defendant to the police station, but Haynes remained in the hallway while the officers questioned James.

Det. Crowden testified that after he advised the defendant of his rights, the defendant signed a waiver form and gave a taped statement wherein he denied any knowledge of the murder.  According to the defendant, he was with his cousin George Haynes at the time of the shooting.  Det. Crowden testified that he then spoke with Haynes.  After speaking with Haynes, Det. Crowden returned to the defendant and questioned him again.  As a result of this brief questioning, the defendant agreed to give a second taped statement.[7]  Det. Crowden testified he advised the defendant again of his rights, and the defendant gave a second statement wherein he admitted shooting Dunn.  Det. Crowden testified he arrested the defendant for Dunn's murder, and he subsequently obtained a warrant to search the defendant's house.  However, no evidence was seized from the residence.

Det. Crowden testified that, during the second statement, the defendant stated that a man named Dwight, who lived across the

---

[7]Transcripts of both statements which James gave to the police may be found in the state record, vol. 6 of 9, pages 382-402.

street from the scene of the shooting, was present when he shot
Dunn.   Det. Crowden testified he contacted Dwight Nelson on
November 10, 1999, and he agreed to give a statement at the Sixth
District police station.   In conjunction with this statement,
Nelson viewed a photographic lineup from which he chose the
defendant's picture as that of the shooter.

Dwight Nelson testified that he lived across the street from
the scene of the shooting.   He stated he knew both Dunn and the
defendant.   Nelson testified that on the evening of August 7, 1999,
he was sitting in a chair on the other side of the street from his
residence.   He testified that he could see Dunn and others,
including the defendant, gambling down the street.   Nelson
testified that at some point Dunn walked up to him, and they
conversed.   He stated that Dunn was counting his money when the
defendant walked up to Dunn and told Dunn to "give it up."   Dunn
refused, and the defendant shot him.   Nelson testified that he
scrambled to get away, and as he was running away he turned and saw
Dunn fall over the chair in which Nelson had been sitting.   Nelson
testified he saw the defendant stand over Dunn and shoot him a
second time.   The defendant stooped down next to Dunn's body, and
then the defendant ran from the scene.   Nelson testified that he
ran to his sister's house and told her to call the police.   Nelson
testified that Dunn was not armed when the defendant shot him.

14

Nelson testified that he did not speak with the police on the night of the shooting out of fear of the defendant, who was among the crowd of people standing in front of his house while the police investigated the shooting.  He indicated that the defendant had changed his clothes by that time.  Nelson admitted that the defendant did not threaten him, point the gun at him, or ask him for any money just prior to the shooting.  Nelson testified that he later gave a statement to the police and chose the defendant's photograph from a lineup.  Nelson positively identified the defendant both at the lineup and in court as the person who shot Dunn.

The State played the tape of the defendant's second statement wherein he confessed to the murder.  In the confession, the defendant admitted he lied in his first statement when he denied any involvement in the murder.  He stated that a few days prior to the shooting he and Dunn were shooting dice.  The defendant stated he won a few turns, and as he was reaching for the money, Dunn insisted that the defendant had not won the round because he "fell off the point."  The defendant stated that he had won, and Dunn then drew a gun and told him he had lost.  The defendant then backed away, and Dunn took his money and left.  The defendant stated he subsequently bought a gun from a "crackhead" and hid the gun in his grandmother's back yard.  The defendant stated that on

15

the day of the shooting he saw Dunn shooting dice with others on Galvez Street.  He stated he waited until the game was over and it got darker, and then he approached Dunn, who was counting money and talking with a man named Dwight who lived in the block.  The defendant stated that he walked up to Dunn and told him to "give it up."  The defendant stated he turned his head and shot twice at Dunn.  When Dunn fell to the ground, the defendant picked up the money Dunn had dropped from his hands and then fled.  The defendant stated that after the shooting, he went home, cleaned himself, and changed clothes.  He sat on his porch, which was in the next block from the shootings, and at some point he went to see a D.J. on S. Broad Street, but he soon returned home.

Dr. Raphael Salcedo testified for the defense as an expert in forensic psychology.  Dr. Salcedo testified that he examined the defendant on five occasions.  He described the defendant's intelligence as borderline to mildly mentally retarded.  He testified that the defendant's overall IQ was 65, but that his verbal score was in the low 70's.  He testified that retardation is considered a mental defect.  He stated that the defendant had primitive responses under stress and lacked some cognitive reasoning, but he maintained that these problems did not render the defendant incapable of determining right from wrong.  In reaching this conclusion, Dr. Salcedo pointed to the defendant's denial of

16

any involvement in the murder and his attempts to establish an alibi.   Dr. Salcedo testified that while the defendant was hospitalized, he functioned at a low average in adaptive (day-to-day) functioning.   He also scored high in his ability to cope with his environment while in the hospital, but that score was in comparison to others with developmental disabilities.   Dr. Salcedo stated that the defendant was able to understand the proceedings against him as long as some extra care was taken.

**STANDARD OF REVIEW**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. §2254.   Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact.   Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under §2254(d)(1) and questions of fact are reviewed under §2254(d)(2).   Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of,

clearly established Federal law, as determined by the Supreme Court

of the United States."  28 U.S.C. §2254(d)(1).   The United States

Supreme Court has noted:

> §2254(d)(1)'s "contrary to" and "unreasonable
> application" clauses have independent meaning.  A federal
> habeas court may issue the writ under the "contrary to"
> clause if the state court applies a rule different from
> the governing law set forth in our cases, or if it
> decides a case differently than we have done on a set of
> materially indistinguishable facts.  The court may grant
> relief under the "unreasonable application" clause if the
> state court correctly identifies the governing legal
> principle from our decisions but unreasonably applies it
> to the facts of the particular case.  The focus of the
> latter inquiry is on whether the state court's
> application of clearly established federal law is
> objectively unreasonable, and we stressed in <u>Williams[ v.
> Taylor</u>, 529 U.S. 362 (2000)] that an unreasonable
> application is different from an incorrect one.

<u>Bell v. Cone</u>, 535 U.S. 685 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be

correct and a federal court will give deference to the state

court's decision unless it "was based on an unreasonable

determination of the facts in light of the evidence presented in

the State court proceeding."  28 U.S.C. §2254(d)(2); <u>see</u> <u>also</u> <u>Hill</u>,

210 F.3d at 485; 28 U.S.C. §2254(e)(1).

## **MERITS**

James argues "that the trial court's factual determination

that he knowingly and intelligently waived his rights at the time

18

he made the second statement [confessing to the murder] was unreasonable in light of the evidence adduced at the two competency hearings." (Rec. doc. 1, p. 11). Based upon this evidence, James "was found incompetent to stand trial and, thus, committed to the forensic facility until he was able to understand the proceedings, especially his constitutional rights." (Rec. doc. 1, p. 11). Because he was deemed incompetent to proceed to trial and needed to receive treatment at a forensic facility, James submits that he "had to have been incompetent at the time the police Mirandized him." (Rec. doc. 10, p. 4).

In <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), the Supreme Court established procedural safeguards designed to protect the constitutional rights of an accused to be free from compelled self-incrimination during a custodial interrogation. To be able to use statements obtained during a custodial interrogation, the State must warn the accused of his right to remain silent and his right to have counsel, retained or appointed, present during interrogation. <u>Id</u>. at 473.

<u>Miranda</u> further established that once the required warnings are provided to the accused, "[i]f the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the

defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." Id. at 475.  "[T]he determination whether the statements obtained during a custodial interrogation are admissible against the accused is to be made upon an inquiry into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forego his rights to remain silent and to have the assistance of counsel." Fare v. Michael C., 442 U.S. 707, 725 (citing Miranda, 384 U.S. at 475-477).

In addressing the instant claim, the Louisiana Fourth Circuit Court of Appeal first set forth the applicable standard of review.

> In State v. Vigne, 2001-2940, p. 6 (La.6/21/02), 820 So.2d 533, 537, the Court set forth the standard for determining whether a confession was voluntarily made:
>
>> A trial judge's ruling on whether or not a statement is voluntary is given great weight and will not be disturbed on appeal unless clearly unsupported by the evidence.  State v. Thornton, 351 So.2d 480, 484 (La.1977).  Before a confession may be introduced into evidence, the state must establish that the accused was advised of his constitutional rights under Article 1, Section 13 of the Louisiana Constitution and the Supreme Court's decision in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); State v. Simmons, 443 So.2d 512 (La.1983).  In Miranda, the United States Supreme Court recognized the coercive atmosphere created by police custody

and established a procedural mechanism to safeguard the exercise of a defendant's Fifth Amendment rights. Before interrogating a suspect in custody, law enforcement officials must inform the suspect that he has the right to remain silent, that his statements may be used against him at trial, that he has a right to an attorney, and that if he cannot afford an attorney, one will be appointed for him.

Even when a defendant has not expressly invoked his rights under Miranda, "[t]he courts must presume that a defendant did not waive his rights." North Carolina v. Butler, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979). A waiver is not established by showing that a defendant was given the complete Miranda warnings and thereafter gave an incriminating statement. 2 Wayne R. LaFave, Jerold Israel, Nancy King, Criminal Procedure, § 6.9(d). Moreover, it is well-settled that a "heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." Taque v. Louisiana, 444 U.S. 469, 470, 100 S.Ct. 652, 653, 62 L.Ed.2d 622 (1980) [Citation omitted.]

In addition, when a defendant raises the voluntariness of his confession due to alleged mental deficiencies which would vitiate his knowing waiver of his rights, the State's burden increases. In State v. Brooks, 92-3331, pp. 11-12 (La.1/17/95), 648 So.2d 366, 373, the Court stated:

When the added factor of Brooks' acknowledged mental retardation is included in the calculus, the issue of the voluntary nature of Brooks' confession becomes enmeshed in the related, but distinct, question of the knowing and intelligent nature of Brooks' waiver. State v. Lindsey, 404 So.2d 466, 472 (La.1981) (citations omitted). Although our jurisprudence has consistently noted that diminished capacity may render a confession involuntary due to the confessor's inability to comprehend the ramifications of his actions, nonetheless we have also noted that the existence of a discernible mental defect does

not invariably vitiate the ability to make a knowing, intelligent, and voluntary waiver of constitutional rights. [State v.] Benoit, [440 So.2d 129 (1983)] supra, at 131; Lindsey, supra, at 472. However, as the State concedes in its brief to this Court, although the defendant bears the burden of proving the existence of any mental abnormality which might render his confession per se involuntary, in the absence of such a showing the State retains the ultimate burden of proving beyond a reasonable doubt that the confession was voluntary and obtained pursuant to a knowing and intelligent waiver of the defendant's constitutional rights. State v. Glover, 343 So.2d 118 (La.1977) (on rehearing). [Citation and footnote omitted.]

The reviewing court must look to the "totality of the circumstances" to determine whether the waiver was knowing, which include the defendant's conduct, experience and background, as well as the facts and circumstances of the case. See State v. Green, 94-0887 (La.5/22/95), 655 So.2d 272; State v. Brown, 98-2214 (La. App. 4 Cir. 12/16/98), 753 So.2d 259.

James, 897 So.2d at 824-825.

Because the Louisiana Fourth Circuit's recitation of the applicable standard of review is not contrary to applicable Supreme Court law, this Court may grant James' habeas petition on this issue only upon a determination that the state court's conclusion, that James knowingly and intelligently waived his rights, represents an unreasonable application of the law to the facts of the case. The pertinent facts, based upon James' habeas claim, is the evidence

adduced at James' competency hearings.[8]

The evidence adduced at James' competency hearings[9] was accurately summarized, in the context of James' waiver of rights claim, by the Louisiana Fourth Circuit as follows.

> The defendant gave his statement on September 14, 1999. In December, 1999 the court ordered a sanity commission to examine the defendant, and the first competency hearing was held on January 25, 2000. At that hearing, Dr. Richard Richoux testified he and Dr. Salcedo examined the appellant on January 11 and found that he had very little comprehension of his legal rights, including his right to remain silent. Dr. Richoux testified there was a possibility the appellant was malingering, but it appeared he had a "significant intellectual deficit", the extent of which he could not determine because the doctors had not administered an intelligence test. Because the scope of the examination was to determine if the defendant was competent to stand trial, the majority of Dr. Richoux's testimony concerned the defendant's ability to understand his legal rights with respect to his trial. However, Dr. Richoux stated: "I would say he did not understand most of what's included in his legal rights." He recommended that the defendant be transferred to the state forensic facility for further testing. The parties stipulated that Dr. Salcedo's testimony would be substantially the same as that of Dr. Richoux.
>
> Although the court found the defendant incompetent to proceed and ordered him transferred to the East Louisiana Mental Health facility in February, 2000, the defendant was not physically sent there until July. He

---

[8]As stated earlier, James claims that he is entitled to federal habeas corpus relief because the State court's conclusion was unreasonable "in light of the evidence adduced at the two competency hearings." See supra at p. 18.

[9]Transcripts of James' competency or lunacy hearings are contained in the State rec., vol. 7 of 9, pp. 455-538.

was tested there, and a psychological evaluation prepared
at the facility on July 27, 2000 indicated his verbal IQ
score was 72 and his performance score was 62, giving him
a full scale score of 65.  The evaluation stated in part:
"The 10 point difference between his Verbal and
Performance IQ score is significant, suggesting his
verbal comprehension abilities are better developed than
his visual/perceptual processing skills." The evaluation
indicated the defendant's verbal skills were in the
borderline range, while his perceptual organization
skills and his working memory were in the mildly mentally
retarded range.

     The defendant was discharged from the facility in
October, 2000.  At the next lunacy hearing, held on June
4, 2001, Dr. Mark Wilson testified that he was a
psychiatrist at the facility, and he met with the
defendant weekly from August, 2000 until the appellant's
discharge in October.  He testified that he and Dr. David
Hale, a psychologist and the director of pre-trial
assessments at the facility, tested the defendant and
conducted legal rights education sessions with him.  Dr.
Wilson testified that testing showed the defendant was
mildly mentally retarded, and as of September, 2000 he
met the competency requirements to stand trial.  Dr.
Wilson further testified that although the defendant was
not competent when he was admitted to the facility in
July, he was close to meeting these requirements when he
was admitted.

     Dr. David Hale testified that he assessed the
defendant when the defendant arrived at the facility and
again before he left.  He testified that the defendant
had borderline competency when he arrived.  He described
the defendant as mildly mentally retarded with somewhat
better adaptive functioning than would be expected from
someone who was mildly mentally retarded, and he
functioned at the upper limits of retardation.

     At the September 20, 2001 lunacy hearing, Dr.
Salcedo testified that he evaluated the defendant five
times, three of these times after he was transferred back
from the facility.  He testified that after the first
examination he believed the defendant was incompetent to
proceed, but he attributed this in part to nervousness
and lack of cooperation on the appellant's part.  He
reiterated that the defendant's verbal IQ score was

higher than that of his performance score, and he
indicated that understanding legal rights is tied to a
person's verbal intelligence, which he described as the
ability to understand verbal information.  He testified
that one of the reasons he recommended that the defendant
be sent to the forensic facility was to rule out any
exaggeration or malingering on the defendant's part.  In
his opinion the defendant was competent to stand trial.
Dr. Richoux testified that he conducted clinical
evaluations on the defendant, and he concurred with Dr.
Salcedo's opinion.[10]

James, 897 So.2d at 829-830 (footnote original).

    Thereafter, the court reiterated some of the testimony supporting

James' argument that he did not knowingly and intelligently waive

his rights, such as Dr. Richoux's testimony from the January, 2000

competency hearing wherein he testified that James "had very little

comprehension of his legal rights, including his right to remain

silent", and stated: "I would say [James] did not understand most

of what's included in his legal rights." Id. at 832.  However, Dr.

Richoux also testified, during the January, 2000 hearing, that there

was a possibility that James was malingering, that is, faking his

_____

        [10]The trial court subsequently appointed two other doctors,
Malik and Deland, to examine the defendant.  They testified at a
hearing on March 14, 2002, but that transcript is not included in
the appeal record, nor is there any documentation of their
findings.  However, because they examined the defendant at least
two years after he gave his confession, it is unlikely their
testimony would have added much to the issue of whether he could
understand his rights when he gave the statements.

symptoms.[11]

The Fourth Circuit also noted Dr. Salcedo's testimony from James' September, 2001 competency hearing wherein he attributed his earlier finding that James was incompetent to proceed to trial, in part, to James' "nervousness and lack of cooperation".  Id.  Further, Dr. Salcedo, like Dr. Richoux, believed that James may have been exaggerating his symptoms.[12]

In James' June, 2001 lunacy hearing, both Dr. Wilson and Dr. Hale testified that James "was borderline competent when he arrived at the forensic facility."  Id.  Additionally, the Louisiana Fourth Circuit specifically considered the fact that James' verbal understanding IQ score of 72 showed borderline retardation, and it is a person's verbal understanding intelligence which "is tied" to an understanding of his or her legal rights.  Id.

Based upon the above, along with the state appellate court's review of James' statements,[13] the motion to suppress hearing

---

[11]See supra at p. 23.

[12]See supra at p. 24.

[13]With regard to James' statements, the Louisiana Fourth Circuit observed:
     In the first taped statement, the defendant indicated he had completed the tenth grade.  He indicated he could read a little and could write.  He denied any participation in the murder, placing himself at two different locations successively on the night of the

testimony,[14] and the trial court's findings based upon the

_____

shooting.  He admitted seeing the victim lying on the
ground after the police arrived on the scene.  He also
admitted having previously seen the victim in the area of
the shooting, which was in the next block from the
defendant's house, but he denied seeing him there on the
day of the murder.

* * * *

The second taped statement itself shows the officers
advised the defendant of his rights at the beginning of
the statement.  In addition, Det. Runmore stated:  "Now,
Lance this means that you don't have to tell us anything.
That you could have a lawyer sitting right here while you
give us this statement.  If you can't afford an attorney,
an attorney will be given to you and anything you tell us
will be used against you in court.  Do you understand
that?"  The defendant replied that he did.  Det. Runmore
then asked the defendant to tell them in his own words
what happened on the night of the murder, and the
defendant gave his statement.

James, 897 So.2d at 828-829.

[14]The Fourth Circuit summarized the suppression hearing
testimony as follows:

[A]t the suppression hearing Det. Crowden
testified that he contacted the defendant's family on
September 14, 1999, and when he learned the defendant
was not at home, he left his card with a message for
the defendant to call him.  Later that night the
defendant called him and indicated his willingness to
speak with the officers, but he needed a ride to the
police station.  Det. Crowden testified the defendant
arrived at the police station at approximately 9:45
p.m., and the officers advised him of his rights and
the fact that he was under investigation for the
murder.  Det. Crowden testified the defendant appeared
to understand his rights.  He identified the waiver of
rights form that the defendant signed, and the
detective insisted the defendant checked the box on the
form indicating he understood his rights.  Det. Crowden
testified the defendant then gave his first taped
statement to him and Det. Runmore.

* * * *

27

suppression hearing testimony,[15] the Louisiana Fourth Circuit

---

> Det. Crowden testified that this first statement matched the brief verbal statement the defendant gave prior to the taped statement.  Because the defendant indicated he was with his cousin George Haynes all day on the date of the murder, Det. Crowden left the room to speak with Haynes, who had accompanied the defendant to the police station.  Det. Crowden stated that there were many inconsistencies in the defendant's first statement, and when he spoke with George Haynes he became even more suspicious because Haynes used exactly the same words to describe his and the defendant's movements on the day of the crime.  Det. Crowden testified that there was a gap of forty to fifty minutes between the time the first taped statement ended and the second one began, and during that time he spoke with Haynes and the defendant was allowed to take a break.
>
> Det. Crowden testified that he went back to the defendant and spoke with him, indicating his suspicions. The defendant then admitted he shot the victim.  Det. Crowden arrested him for murder and re-advised him of his rights.  The defendant then gave his second taped statement wherein he confessed to killing the victim. Det. Crowden testified the defendant indicated he understood his rights, and the detective denied forcing or coercing the confession or promising the defendant anything in return for the confession.

James, 897 So.2d at 828.

---

[15]The Louisiana Fourth Circuit took note of the following findings on the part of the trial court based upon the testimony presented at the suppression hearing.

> The [trial] court noted that considering the totality of the circumstances of the case as presented at the hearing, the defendant admitted having a tenth-grade education and that he could read and write.  The court found that based on the evidence presented at the hearing, the State showed the defendant was "sufficiently aware of the import of his statements to fabricate a story and solicit help from his cousin as a backup."  The court noted the fact that the defendant had the

concluded that the trial court did not err in denying James' motion to suppress, thereby finding that James' statements to police were knowingly and intelligently provided.

This Court finds that the state court's conclusion in this regard does not represent an unreasonable application of Supreme Court law to the facts of this case.[16]    Accordingly, James' claim for federal habeas corpus relief is without merit.

James also argues that he received ineffective assistance of counsel due to trial counsel's failure to investigate his mental health history and failure to interview potential witnesses who could have supported his insanity defense.   James contends that

---

> intellectual capacity to play dice, and it stated that the defendant's responses on the tape led the court to find the defendant understood his rights.   The court specifically stated:   "The defense has introduced no evidence that would refute the conclusion that the statements were voluntary and made with a knowing and intelligent waiver of rights."

James, 897 So.2d at 829.

[16]In making this finding, the Court is mindful of the admonition recently set forth in the factually similar case of Daoud v. Davis, ___ F.3d. ___, 2010 WL 3324712, *3 (6th Cir. 2010):

> We may not issue the writ 'simply because [we] conclude[] in [our] independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable. Williams v. Taylor, 529 U.S. 362, 411, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

there was no justification for his trial counsel not to call potential witnesses, such as his mother, grandmother, and a former school teacher, "M. Sanders", who "could have testified about his strange, aggressive and psychotic behavior at home and in school." (Rec. doc. 1, pp. 13-14).  According to James, counsel also should have requested funds for the purpose of hiring another expert to support an insanity defense, rather than relying "solely on the testimony of Dr. Salcedo who only examined petitioner to determine his mental capacity to stand trial", not his mental capacity at the time of the murder.  (Rec. doc. 1, p. 15).

The seminal Supreme Court decision regarding ineffective assistance of counsel is <u>Strickland v. Washington</u>, 466 U.S. 668, 697 (1984), wherein the Court held that in order to prove that counsel was ineffective, petitioner must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense.  If a court finds that petitioner has made an insufficient showing as to either one of the two prongs of inquiry, it may dispose of the claim without addressing the other prong.

Under the deficient performance prong of the <u>Strickland</u> test, "it is necessary to 'judge...counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's

conduct.'"   <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 371 (1993) (citing <u>Strickland</u>, 466 U.S. at 690).   To prove prejudice under the <u>Strickland</u> standard, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694.

A review of the trial transcript reflects that James is mistaken with regard to the scope of Dr. Salcedo's examinations.   Dr. Salcedo did not merely examine petitioner for the purpose of determining whether or not he was mentally competent to proceed to trial.   He also offered his opinion, based upon his examinations of James and his analysis of James' records, as to whether or not James was legally insane at the time of murder.

CROSS-EXAMINATION OF DR. SALCEDO BY MR. JORDAN:
Q.  You were asked to review if whether-or-not the defendant was able to distinguish between right and wrong; is that correct?

A.  Right

Q.  You interviewed Mr. James for that purpose?

A.  Yes.

Q.  You also reviewed documents provided to you as well?

A.  That's correct.

Q.  You looked at the circumstances of the offense; is that correct?

A.  That's correct.

Q.  You're basis for your conclusion was . . . based on your interviews of Mr. James?

A.  Right.

Q.  And based on your analysis of documents provided; correct?

A.  That is correct.

Q.  What was your conclusion?

A.  My conclusion was that or my recommendation to the court was that I did not feel Mr. James' level of mental retardation or level of intellectual impairment was sufficient to render him incapable of distinguishing right from wrong which is what the jury will ultimately have to conclude.  The evidence and the da[ta] I had available, in my opinion, did not rise to the level where he would have been incapable of distinguishing right from wrong.  So my recommendation to the court was that he be found to have been legally sane at the time of the alleged offense.

State rec., vol. 7 of 9, pp. 610-611.

In addition, the Court notes that, in his second statement given to the police on September 14, 1999 in which James confessed to the crime with which he was charged, he voluntarily acknowledged that he knew that his actions had been wrong.  This confession was

received into evidence at James' trial and was published to the
jury.  On this point the following colloquy is pertinent:

> QQ.  And then, then what did you do?
>
> A.    Go outside and sit on the porch.
>       And sit by myself and the police and everything was still
>       down there.  I just sat by myself on my porch.
>       **I know what I did, what I did was wrong.  Like man, I was
>       like man I done shot this man.  I didn't know what I was
>       gone do.**   ...
>
> Q.    Is there anything you would like to add or delete from this
>       statement?
>
> A.    Just that, **I know what I did was wrong. I wasn't shooting
>       to kill him tho.  That's all and, that's all.**

> (St. Rec., vol. 6 of 9, pp. 401-402).

Based upon the above, this Court finds that James was not
prejudiced by counsel's alleged deficiency in failing to call his
mother, grandmother, and former teacher as witnesses.  Their
testimony as to James' alleged strange behavior at some unspecified
time in the past, for purposes of supporting an insanity defense,
could not have overcome Dr. Salcedo's expert opinion that James was
legally sane at the time of the murder.  Likewise, counsel cannot
be faulted for not seeking funds for additional expert testimony
when Dr. Salcedo, a defense expert, was of the opinion that James
was legally sane at the time of the murder.  Requesting funds for

the purpose of acquiring yet another expert to offer testimony regarding whether or not James could distinguish between right and wrong at the time of the murder would have been a futile effort on the part of counsel, particularly in light of James' own statement to the contrary.

Accordingly;

## RECOMMENDATION

It is hereby **RECOMMENDED** that the instant application for federal habeas corpus relief be **DISMISSED WITH PREJUDICE.**

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.   28 U.S.C. §636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996)(en banc).[17]

---

[17]Douglass referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. §636(b)(1) was amended to extend that period to fourteen days.

New Orleans, Louisiana, this __9th__ day of ___November___, 2010.

_Alma L. Chasez_

ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE